# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DAVID E. GROCHOCINSKI, Chapter 7 Trustee, | ) ) ) | |
| Plaintiff/Appellee | ) ) ) | No. 08 C 4124 |
| v. | ) ) | Judge Ruben Castillo |
| DAVID SCHLOSSBERG and GARY LALIBERTE | ) ) ) | |
| Defendants/Appellants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on direct appeal from the United States Bankruptcy Court pursuant to 28 U.S.C. § 158(a). On October 14, 2005, Jeffery Eckert (the "Debtor"), filed a voluntary Chapter 7 bankruptcy petition. (R. 3, 3-3, Bk. Dkt. No. 104, at 4.) On May 24, 2007, the Debtor's Chapter 7 Trustee, Plaintiff/Appellee David E. Grochocinski (the "Trustee"), filed an adversary complaint to recover the Debtor's alleged fraudulent transfers of two parcels of real property to David Schlossberg ("Schlossberg") and Gary Laliberte ("Laliberte"), (collectively, "Appellants"). (Id. at 13.) On April 14, 2008, the case went to trial before the Honorable John H. Squires ("Judge Squires") of the United States Bankruptcy Court for the Northern District of Illinois. (Id. at 1.) On June 3, 2008, the bankruptcy court issued its ruling in favor of the Trustee, holding that the Debtor's transfers of property to Appellants were fraudulent and therefore avoidable. (Id. at 2.) On July 21, 2008, Appellants filed this action appealing the bankruptcy court's entry of judgment against them. (R. 1, Appeal.) This Court affirms.

## RELEVANT FACTS

### A. Union Court Property Transfer

On August 4, 2002, the Debtor entered a sales contract with Bartlett One LLC,

("Bartlett") for the construction of a new home at 1073 Union Court, Bartlett, Illinois (the

"Union Court Property"). (R. 3, 3-3, Bk. Dkt. No. 104, at 5.) During the next twelve months,

and prior to completion of the house, the Debtor made cash payments under the sales contract

totaling $120,000 toward the purchase price of $804,674.50. (*Id.*) In July 2003, when Bartlett

was ready to close on the property, the Debtor entered an agreement with Appellants to assign

them his rights under the contract with Bartlett.[1] (*Id.*) Pursuant to the July 23, 2003, written

agreement between the Debtor and Appellants (the "Articles of Agreement"), the Debtor could

repurchase the Union Court Property from Appellants if he made monthly payments and a final

balloon payment on an unspecified date. (*Id.* at 6.)

In addition to the above facts, the bankruptcy court found that there was also an unwritten

side agreement between the Debtor and Appellants, whereby Appellants would apply the

Debtor's $120,000 equity toward the purchase of the Union Court Property, and then secure a

mortgage for the remaining balance of the purchase price, which the Debtor would pay on a

monthly basis. (*Id.* at 5.) The Debtor would also pay Appellants a premium, over and above the

mortgage, creating a "spread" that amounted to Appellants' profit for purchasing the Union Court

Property. (*Id.*) Despite the Debtor's continuing equity interest in the Union Court Property,

---

[1] Appellants also entered a partnership agreement with each other ("Appellants' Partnership Agreement"), whereby they agreed to purchase the Union Court Property for the purpose of reselling the property to the Debtor. (R. 3, 3-4, Trial Ex. PX-13.)

under this side agreement only Appellants would be listed as purchasers on the deed. (*Id.*) The Debtor and his family would continue to reside in the property. (*Id.* at 7.)

On February 10, 2004, the Debtor sent an email to Schlossberg stating, "[T]his contract for deed is a great way to protect my assests [sic] since I trust you and you hold title I am asset free almost . . . i.e. 'why sue Jeff, he aint [sic] got nothing!' [sic] . . . I like the idea of keeping my house safe." (*Id.* at 7.) On June 23, 2004, the Debtor sent another email to the Schlossberg confirming "the deal with asset protection in mind . . . ." (*Id.*)

### 1. Debtor's Financial Posture

On November 13, 2003, the Debtor and another business associate, Gregory Steiner ("Steiner"), entered an agreement where Steiner committed to form a new entity, AgriStar Frozen Foods, Inc. ("AgriStar") to engage in a joint venture with the Debtor's company, Platinum Frozen Foods, Inc. ("Platinum"). (*Id.* at 8.) The Debtor represented to Steiner that Platinum was solvent and able to carry out its obligations under the agreement. (*Id.* at 8.) However, at the time he entered the agreement, the Debtor knew that Platinum would not be able to live up to its obligations under the agreement. (*Id.*) The Debtor testified that at the time he entered the agreement with Steiner, a judgment had been entered against him personally, and he did not have any money to invest in Platinum. (*Id.*)

In 2004, Steiner and AgriStar filed a complaint against Platinum alleging that the Debtor repeatedly failed to fulfill the terms of the agreement with Steiner, and that the Debtor engaged in bad-faith acts including fraud, forgery, and misappropriation of AgriStar's money. (*Id.*) According to the complaint, AgriStar was forced to cover $500,000 worth of expenses caused by

3

Platinum's breach and the Debtor's embezzlement and fraudulent transfer of funds out of AgriStar's account. (*Id.* at 10.)

In addition to the suit by AgriStar, the Debtor incurred significant monetary obligations during this period. The Debtor owed $140,000 in payroll taxes for Platinum to the Internal Revenue Service ("IRS") for the period of 2003-2004. (*Id.* at 9.) He also owed $250,000 in "941 estimated taxes" for the period of 2002-2004. (*Id.*) Additionally, the Debtor allegedly owed $120,000 in child support to Christine Eckert ("Christine") for the period of 2002-2005.[2] (*Id.*) Finally, the Debtor was personally liable for Platinum's failure to pay approximately $607,800 for perishable agricultural commodities purchased from November 2002 through November 2003, in violation of the Perishable Agricultural Commodities Act ("PACA").[3] (*Id.*)

### 2. June 2005 Sale of the Union Court Property

After the transfer of the Union Court Property to Appellants in July 2003, the Debtor continually fell behind in payments. (*Id.* at 10.) The parties agreed that their arrangement was not working, and as a result, the Debtor found another purchaser for the Union Court Property, Marcelo Carlos ("Carlos"). (*Id.*) On June 8, 2005, Appellants sold the Union Court Property to Carlos for $920,000. (*Id.*) Prior to Appellants' transfer of the Union Court Property to Carlos,

---

[2] Appellants argue that based on Christine's testimony at trial, the Debtor did not owe her child support and no court order had ever been entered for the Debtor to pay support. (R. 14, Appellants Br. at 12.) The transcript of Christine's testimony, however, was not included with the Appellants' exhibits. The Debtor testified that to his knowledge, no court order was ever entered by any court directing him to pay support to Christine. (R. 3, 3-5, Trial Ex. PX-62 at 161:3-162:17.)

[3] The Debtor testified that as the administrator of the PACA license for Platinum, he knew he was personally liable for any PACA violation. (*Id.*) In 2005, Platinum was cited for willful, repeated, and flagrant violations of PACA. (*Id.*)

4

the Debtor assigned his right, title, and interest in the option to purchase the property to Christine in consideration for alleged outstanding child support payments.[4] (*Id.*) The net proceeds of the sale totaled approximately $200,000, including a payment of approximately $18,000 to Christine, $76,207 to Carlos, and $53,000 to Laliberte.[5] (*Id.* at 11.) Appellants were jointly paid the remaining $52,357.54 of the $200,000 proceeds from the sale of the Union Court Property. (*Id.*) The Debtor remained in possession of the Union Court Property until he stopped making payments to Carlos and moved out in the fall of 2005. (*Id.*)

### B. The Tunbridge Property Transfer

In November 2004, the Debtor unsuccessfully attempted to sell another property, 2072 Tunbridge Trail, Algonquin, Illinois (the "Tunbridge Property") for $429,000. (*Id.*) On December 31, 2004, the property appraised for $420,000. (*Id.*) On January 19, 2005, the Debtor sold the Tunbridge Property to Schlossberg for $325,000, which was $95,000 less than the property's appraised value. (*Id.*) Although the Tunbridge Property was encumbered by mortgages in excess of its appraised value, the Debtor and/or Schlossberg convinced the mortgage company to accept less than the balance so as to avoid any cloud on the title. (*Id.* at 13.) The Debtor and Schlossberg entered an agreement whereby they would share in the profits on the resale of the Tunbridge Property. (*Id.*) Pursuant to this agreement, the Debtor would

---

[4] The Debtor testified at trial that he forged Christine's signature on the documents allegedly signed by Christine. (*Id.* at 10-11.) Additionally, at the Debtor's direction, Christine signed a contract between herself and Appellants to free the title of the Union Court Property for sale. (*Id.* at 11.)

[5] This was repayment for a loan Laliberte obtained from a third party to close the deal. (*Id.*)

receive forty percent of the profit from the resale. On December 9, 2005, Schlossberg resold the Tunbridge Property for $455,000. (*Id.*)

### C. The Sanctions Order

On December 20, 2007, counsel for the Trustee sent a letter to Appellants giving them notice to retain all electronic discovery related to the Trustee's adversary proceeding. (R. 3, 3-3, Bk. Dkt. No. 86, Ex. A.) On March 24, 2008, the Trustee filed a motion seeking in part to compel Schlossberg to provide access to all computer hard drives which contained data related to the transfers. (R. 3, 3-3, Bk. Dkt. No. 60.) On April 4, 2008, the bankruptcy court granted the Trustee's motion and entered a protective order (the "Protective Order") related to the production of information on Schlossberg's computers. (R. 3, 3-3, Bk. Dkt. No. 77 at 1.) Pursuant to the terms of the Protective Order, an expert from a computer forensic services firm (the "computer expert") was hired to mirror the hard drives of Schlossberg's computers and to act as a custodian of the data contained therein. (*Id.*) On April 7, 2008, the computer expert analyzed Schlossberg's computers and made the following conclusions: (1) that a disk cleaning program called "nCleaner" was installed and launched on at least two computers as of April 1, 2008; (2) over 16,000 files on at least two computers had been destroyed on or around April 1, 2008; (3) overwriting operating systems were installed on two of the computers in January - February 2008; and (4) a program to verify the integrity of the data destruction had been installed on the computers. (R. 3, 3-3, Bankr. Dk. No. 88, Ex. A at 3-10.)

On April 9, 2008, the Trustee filed a motion seeking sanctions against Schlossberg based on the evidence from the computer expert. (R. 3, 3-3, Bk. Dkt. No. 86. at 1.) On April 11, 2008, the bankruptcy court held a hearing on the sanctions motion. (R. 3, 3-6, 4/11/08 Hearing

6

Transcript.) The bankruptcy court found that the evidence, which Schlossberg was under a duty to preserve, had been spoiled. (*Id.* at 11:21-13:13.) On April 14, 2008, the bankruptcy court entered an order of sanctions (the "Sanctions Order") against Schlossberg. (R. 3, 3-3, Bk. Dkt. No. 94.) The Sanctions Order stipulated that the facts as alleged by the Trustee relating to Schlossberg were taken as proof against him, and that he was prohibited from introducing testimony or other evidence in opposition to those facts. (*Id.* at 2.) Additionally, Schlossberg was ordered to pay various costs of Trustee's counsel and the computer expert. (*Id.*)

## PROCEDURAL HISTORY

On May 24, 2007, the Trustee filed a complaint to avoid and recover the Debtor's alleged fraudulent transfers of the Union Court Property and the Tunbridge Property. (R. 3, 3-3, Bk. Dkt. No. 104, at 13.) On April 14, 2008, a bench trial was held before Judge Squires. (*Id.* at 14.) On June 3, 2008, the bankruptcy court entered judgment in favor of the Trustee, determining that the property transfers were fraudulent conveyances under the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 ILCS 160/1 *et seq.* (*Id.* at 2-3.) The bankruptcy court entered judgments against Appellants for $120,000 and $52,357.54, the value of the Debtor's interest in the Union Court Property. (*Id.*) In addition, a $109,000 judgment was entered against Schlossberg only for the value of the Debtor's interest in the Tunbridge Property. (*Id.* at 2.)

On June 21, 2008, Appellants filed an appeal from the bankruptcy court's judgment pursuant to Federal Rule of Bankruptcy Procedure 8001. (R. 1, Appeal.) Appellants argue that the bankruptcy court erred in finding that the Debtor fraudulently transferred his interest in the Union Court Property to Appellants. (R. 14, Appellant Br. at 1.) Additionally, Appellant Schlossberg argues that the bankruptcy court erred in assessing the amount of damages against

him arising from the court's finding that the Debtor's transfer of the Tunbridge Property was fraudulent. (*Id.*) Schlossberg also argues that the bankruptcy court abused its discretion in entering the Sanctions Order against him. (*Id.*)

## LEGAL STANDARDS

This Court sits as an appellate court in reviewing the bankruptcy court's rulings. 28 U.S.C. § 158(a)(1). The bankruptcy court's factual findings are reviewed for clear error, and its legal conclusions are reviewed *de novo. Dollie's Playhouse, Inc. v. Nable Excavating, Inc.*, 481 F.3d 998, 1000 (7th Cir. 2007). "Clear error is an extremely deferential standard of review, and will only be found to exist where the 'reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). Accordingly, this Court may not "reverse the finding of the trier of fact simply because. . . [we] would have decided the case differently." *Id.*

This Court reviews the imposition of discovery sanctions for abuse of discretion. *Maynard v. Nygren*, 332 F.3d 462, 467 (7th Cir. 2003). Thus, this Court will uphold any exercise of the bankruptcy court's discretion that could be considered reasonable, "even if we might have resolved the question differently." *Id.* Additionally, the factual findings underlying the bankruptcy court's imposition of sanctions are reviewed for clear error. *Negrete v. Nat'l R.R. Passenger Corp.*, 547 F.3d 721, 724 (7th Cir. 2008).

## ANALYSIS

### A. Union Court Property Transfer and Damages

Appellants first argue that the bankruptcy court erred in finding that the Debtor fraudulently transferred his interest in the Union Court Property to Appellants within the meaning of the IUFTA. (R. 14, Appellant Br. at 1.) Under the IUFTA, there are two types of fraud; actual fraud or "fraud in fact," and constructive fraud or "fraud in law." *Wachovia Sec., LLC v. Jahelka*, 586 F. Supp. 2d 972, 109 (N.D. Ill. 2008). Fraud in fact exists when the debtor has the specific intent to hinder his creditors. *Id.* Fraud in law exists when the debtor conveys assets for inadequate consideration, rendering himself insolvent during a time when he has existing or contemplated indebtedness. *Id.* at 110-11. Sections 160/5(a)(2) and 160/6 of the IUFTA address fraud in law, while Section 160/5(a)(1) deals with fraud in fact. 740 ILCS §§ 160/5, 160/6. The bankruptcy court found both fraud in law and fraud in fact in this case. (R. 3, 3-3, Bk. Dkt. No. 104 at 2-3.) Appellants argue that the conveyance was not fraudulent under either definition. (R. 14, Appellant Br. at 1.)

#### 1. Fraud in Fact: IUFTA 160/5(a)(1)

Appellants argue that the bankruptcy court erred in finding that the Debtor "had an actual intent to hinder, delay, or defraud his creditors," when he transferred his interest in the Union Court Property. (R. 14, Appellant Br. at 9.) To establish fraud in fact under the IUFTA, a debtor must transfer property with the specific intent to hinder, delay, or defraud his creditors. 740 ILCS 160/5(a)(1); *Kunz v. City of Chicago,* No. 01 C 1753, 2007 U.S. Dist. LEXIS 7958, at *8 (N.D. Ill Jan. 31, 2007).

The IUFTA sets forth eleven factors, referred to as "badges of fraud," to guide courts in determining if the debtor possessed the requisite intent. *Id.* The factors are: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. 740 ILCS 160/5(b). When these factors are present in sufficient number, the Trustee establishes a presumption of fraud, which must then be rebutted. *Kunz*, 2007 U.S. Dist. LEXIS 7958 at \*9.

The February 10, 2004 email to Schlossberg, provides evidence that the Debtor entered the agreement with Appellants to ensure his house would be protected from creditors. (*See* R. 3, 3-3, Bk. Dkt. No. 104, at 7.) Appellants contend that the email is not evidence of specific intent since it was written seven months after the transfer of the Union Court Property. (R. 14, Appellant Br. at 9.) However, Appellants fail to cite precedent supporting their claim that evidence of the Debtor's specific intent cannot come after-the-fact. Moreover, Appellants state that the bankruptcy court "relied exclusively" on the email to determine the Debtor's actual intent to fraudulently transfer the Union Court Property. (*Id.*) However, the bankruptcy court's

reliance on the Debtor's email was hardly exclusive. In addition to the email, the bankruptcy court also evaluated the badges of fraud set forth by the IUFTA. (*See* R. 3, 3-3, Bk. Dkt. No. 104 at 45-49)("Even though direct evidence of the Debtor's fraudulent intent exists, the Court turns to the badges of fraud to determine whether the July 2003 transfer of the Union Court Property was intended to harm the Debtor's creditors.").)

After finding "that most of the badges of fraud" were present in this case, the bankruptcy court concluded that the Debtor had actual intent to hinder, delay, or defraud his creditors under the IUFTA. (*Id.* at 49.) Appellants specifically challenge four of the bankruptcy court's findings regarding the badges of fraud.[6] (R. 14, Appellant Br. at 10-15.)

### a. Reasonably Equivalent Value

Appellants claim that the bankruptcy court erred in finding that the Debtor did not receive reasonably equivalent value for the transfer of his interest in the Union Court Property.[7] (R. 14, Appellant Br. at 10.) The Seventh Circuit has held that there is no fixed formula for determining reasonable equivalence, and that such a determination will depend on the facts of each case. *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997); *see also Wachovia*, 586 F. Supp. 2d at 112. Several factors, however, have been utilized including: (1) whether the value of what was transferred is equal to the value of what was received; (2) the fair market value of what was

---

[6] Appellants do not challenge the bankruptcy court's findings that the Debtor retained possession of and control over the Union Court property, and that before the transfer was made, the Debtor had been sued and threatened with suit.

[7] The Court rejects the Trustee's argument that the issue is waived because Appellants did not raise a affirmative defense regarding reasonably equivalent value in the Appellants' Answer to the Complaint. (*See* R. 23, Appellee Br. at 19.) The issue of reasonably equivalent value is an element of the *prima facie* case to prove fraud in law. *See GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997). Furthermore, the issue is relevant to the Court's determination of fraud in fact. *See* 740 ILCS 160/5(b).

transferred and what was received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee. *Id.*

The bankruptcy court found that Appellants "did not give the Debtor any value for their right to purchase the Union Court Property." (R. 3, 3-3, Bk. Dkt. No. 104 at 47.) The Union Court Property had a $804,674.50 purchase price in the sales contract. (*Id.*) Appellants obtained mortgages for $643,079.60, the purchase price less the $120,000 that the Debtor already paid toward the purchase of the property. (*Id.*) Thus, the bankruptcy court found that Appellants received the benefit of the Debtor's $120,000 without consideration.[8] (*Id.*)

In addition, the bankruptcy court determined that the transfer of the Union Court Property did not take place at arm's length. (*Id.* at 48.) Based on the unwritten agreement between the Debtor and Appellants, the bankruptcy court found that "the Debtor devised a scheme whereby [Appellants] were to act as his contract purchasers to buy the Union Court Property in their names in order to assist the Debtor in 'keeping [his] house safe.'" (*Id.*) The bankruptcy court concluded that the unwritten agreement demonstrated a lack of good faith, because it served to conceal the Debtor's true interest in the Union Court Property. (*Id.*) The bankruptcy court's finding of an unwritten agreement between the Debtor and Appellants is supported by the record and therefore is not clearly erroneous.[9]

---

[8] The bankruptcy court noted that while the Debtor had the "benefit" of residing in the Union Court Property, he nonetheless made rent payments to Appellants. (*Id.* at 47.) Therefore, this was not consideration for the $120,000 that the Debtor already paid toward the purchase of the property.

[9] To reach its conclusion, the bankruptcy court relied on the following documents: R. 3, 3-4, Trial Ex. PX-16, PX-18, PX-19, PX-20, PX-21; R. 3, 3-5, Trial Ex. PX-62, PX-66. *Id.*

For these reasons, this Court is not left with the firm conviction that the bankruptcy court erred in finding the Debtor did not receive a reasonably equivalent value in the Union Court Property transaction. Therefore, this Court affirms the bankruptcy court's finding that the Debtor did not receive reasonably equivalent value.

### b. The Debtor Was Insolvent

Appellants next claim that the bankruptcy court erred in finding that the Debtor was insolvent at the time of the Union Court Property transfer in July 2003. (R. 14, Appellant Br. at 11.) Under the IUFTA, a fraudulent intent may be found where "the debtor was insolvent *or became* insolvent shortly after the transfer was made or the obligation was incurred." 740 ILCS 160/5(b)(9)(emphasis added). Insolvency is a question of fact, and the bankruptcy court has broad discretion to determine insolvency. *In re Doctors Hosp. of Hyde Park, Inc.*, 360 B.R. 787, 853 (Bankr. N.D. Ill. 2007). Under the IUFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 ILCS 160/3(a). The IUFTA also provides that "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." 740 ILCS 160/3(b).

The Court finds that the bankruptcy court's finding of insolvency is supported by the evidence, and therefore not clearly erroneous. The bankruptcy court based its finding of insolvency on the Debtor's Amended Statement of Financial Affairs (the "Financial Statement"), and his testimony at trial. (R. 3, 3-3, Bk. Dkt. No. 104, at 47.) The Financial Statement clearly illustrates that the Debtor was "balance-sheet insolvent" when the statement was filed in January 2006. (R. 3, 3-5, Trial Ex. PX-50.) The Debtor's liabilities of $848,268 exceeded his assets of $15,600, and his monthly assets of $13,102 surpassed his monthly income of $5,600. (*Id.*)

Moreover, the Financial Statement shows that in 2003, during the time of the transfer, the Debtor was personally liable for the following debts incurred by his company: $140,000 in payroll taxes for the period 2003-2004; and $250,000 in "941 estimated taxes" to the IRS for the period of 2002-2004. (*Id.*) Additionally, the Debtor listed a debt for child support in the amount of $120,000 for the period of 2000-2005. (*Id.*)

Further, the bankruptcy court found that the Debtor's testimony at trial further demonstrated that he was insolvent or became insolvent shortly after the transfer was made. (R. 3, 3-3, Bk. Dkt. No. 104 at 47.) The Debtor testified that he was unable to obtain a loan to fund the full purchase price of the Union Court Property. (*Id.*) He also testified that he had a judgment entered against him and admitted that he was "being sued by everybody" at the time. (*Id*; R. 3, 3-5, Trail Ex. PX-62 at 58:17-23.)

Given that the bankruptcy court has broad discretion when considering evidence to support a finding of insolvency, its reliance on the aforementioned evidence was not clearly erroneous.

### c. Appellants Were Insiders

Appellants next claim that the bankruptcy court erred in finding that they were "insiders," within the meaning of the IUFTA. (R. 14, Appellant Br. at 13.) An "insider," as defined by the statute, includes a relative or partner of the debtor. 740 ILCS 160/2(g). Appellants argue that the bankruptcy court erroneously intertwined the Appellants' Partnership Agreement (where the Debtor was not a party) with the Articles of Agreement (where the Debtor and Appellants were all parties), in order to find that Appellants were partners or joint venturers of the Debtor. (R. 14, Appellant Br. at 13.) The bankruptcy court, however, based its finding that Appellants and the

14

Debtor were partners on the unwritten side agreement, not the written agreements. (R. 3, 3-3, Bk. Dkt. No. 104 at 46.) As previously discussed, this Court finds that there is sufficient evidence in the record to support the bankruptcy court's finding of an unwritten side agreement between the parties, and therefore, this finding was not clearly erroneous.

Furthermore, there is sufficient evidence that the unwritten agreement created a joint venture or partnership between the parties. A joint venture is an association of two or more entities to carry out a single, specific purpose for a profit. *Daniels v. Corrigan*, 886 N.E.2d 1193, 1208 (Ill. App. Ct. 2008). A joint venture may be inferred from circumstances demonstrating the parties' intent to enter into a joint venture, even in the absence of a formal agreement. *Id.* The bankruptcy court found that pursuant to the unwritten side agreement between the parties, the Debtor was able to retain his $120,000 equity interest in the Union Court Property, and Appellants shared profits from the "spread" that the Debtor paid over the mortgage. (R. 3, 3-3, Bk. Dkt. No. 104, at 5-6.). The Court finds that the bankruptcy court's determination that this association between the Debtor and Appellants created a joint venture where by each party profited, was not in error. Accordingly, this Court affirms the bankruptcy court's finding that the Appellants were partners or joint venturers and thus "insiders" under the IUFTA.

### d. The Debtor's Interest Was Concealed

Appellants next argue that the bankruptcy court erred in finding that the Union Court Property transaction was concealed because the parties' rights were fully disclosed in the Articles of Agreement, and recorded at the Office of the DuPage County Recorder. (R. 14, Appellant Br. at 15.) The bankruptcy court found, however, that "even though the [Articles of Agreement] for the sale of the Union Court Property to [Appellants] was recorded and therefore disclosed, the

side agreements that the Debtor had with [Appellants] were concealed . . . ." (R. 3, 3-3, Bk. Dkt. No. 104 at 46.) The terms of the unwritten agreement were not included in the Articles of Agreement; thus the Debtor's true interest in the Union Court Property was not recorded. Accordingly, the bankruptcy court did not err in finding that the Debtor's true interest in the Union Court Property transfer was concealed.

In conclusion, the bankruptcy court's finding that the Debtor transferred the Union Court Property to Appellants with actual intent to hinder, delay or defraud his creditors was not clearly erroneous. This Court finds that there is evidence that the Debtor expressed his actual intent to fraudulently transfer the Union Court Property via email. Moreover, the bankruptcy court did not err in its findings, with regard to the badges of fraud, that: (1) the Debtor did not receive a reasonably equivalent value for the transfer; (2) the Debtor was insolvent; (3) Appellants were insiders; and (4) the Debtor's true interest in the Union Court Property was concealed. Pursuant to the IUFTA, these badges of fraud (in addition to the badges that Appellants did not dispute) establish that the Debtor had the specific intent to hinder, delay or defraud his creditors. Accordingly, this Court affirms the bankruptcy court's finding of fraud in fact based on the fraudulent transfer of the Union Court Property.

### 2. Fraud in Law: IUFTA 160/5(a)(2) and 160/6(a)

Appellants alternatively assert that the bankruptcy court erred in finding that the Debtor's transfer of the Union Court Property established fraud in law under the IUFTA. (R. 14, Appellant Br. at 10.) Unlike fraud in fact, fraud in law does not require proof of fraudulent intent. *Soc'y of Lloyd's v. Collins*, 284 F.3d 727, 730 (7th Cir. 2002). Rather, fraud in law is presumed when the debtor makes a voluntary transfer without consideration or for inadequate

16

consideration, that hinders or delays the rights of his creditors. *Id.* The Trustee has the burden of

proving fraud in law by a preponderance of the evidence. *In re Phillips*, 379 B.R. 765, 778

(Bankr. N.D. Ill. 2007).

Sections 160/5(a)(2) and 160/6(a) of the IUFTA set forth the requirements for

establishing a fraud in law transfer. Under Section 160/5(a)(2), four elements must be present:

(1) the debtor made a voluntary transfer; (2) at the time of the transfer, the debtor incurred

obligations elsewhere; (3) the debtor made the transfer without receiving a reasonably equivalent

value in exchange; and (4) after the transfer the debtor failed to retain sufficient property to pay

his indebtedness. *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir.

1997); *In re Phillips*, 379 B.R. at 778. The first two elements to establish fraud under Section

160/6(a) are the same as those under 160/5(a)(2). *In re Joy Recovery Tech. Corp.*, 286 B.R. 54,

77 (Bankr. N.D. Ill. 2007). In addition, Section 160/6(a) requires that at the time of the transfer,

the Debtor was insolvent or was made insolvent as a result thereof. *Id.*

The bankruptcy court found that the Trustee established all of the elements for fraudulent

transfers under both Sections 160/5(a)(2) and 160/6(a). (R. 3, 3-3, Bk. Dkt. No. 104 at 50-52.)

Again, Appellants specifically challenge the bankruptcy court's findings that the Debtor was

insolvent (or became insolvent) at the time of the transfer and that he did not receive reasonably

equivalent value in exchange for the transfer. (R. 14, Appellant Br. at 10-13.) As this Court

previously discussed in our fraud in fact analysis, there was no clear error in the bankruptcy

court's finding that the Debtor was insolvent[10] and that he did not receive reasonably equivalent

---

[10] The same analysis the bankruptcy court used to establish the Debtor's insolvency, also
establishes the element under Section 160/5(a)(2), that at the time of the transfer, the Debtor
"incurred obligations elsewhere." Specifically, the bankruptcy court found that in 2003 the

value for the transfer. Accordingly, this Court affirms the bankruptcy court's finding of fraud in law based on the fraudulent transfer of the Union Court Property.

### 3. Damages

Once a fraudulent transfer has been established, the IUFTA provides relief to avoid the transfer. *See* 740 ILCS 160/8; 160/9. Under the statute, "the Trustee is entitled to recover the property transferred or obtain a money judgment for the value of the assets transferred, less certain adjustments for the amounts paid by the transferee." *In re Hennings Feed & Crop Care, Inc.*, 365 B.R. 868, 890 (Bankr. C.D. Ill. 2007). The bankruptcy court reasoned that after the transfer, the Debtor's equity in the Union Court Property was preserved via the doctrine of equitable conversion. (R. 3, 3-3, Bk. Dkt. No. 104 at 46.) Thus, the bankruptcy court found that the Debtor was entitled to $52,357.54, the amount Appellants received as profit from the June 8, 2005, resale of the Union Court Property, because this payment came directly out of the Debtor's equity in the property. (*Id.* at 49-50.)

Appellants argue that the bankruptcy court erred in assessing damages against them based on the resale of the Union Court Property. (R. 14, Appellant Br. at 15-18.) Appellants assert that the doctrine of equitable conversion is inapplicable, and therefore the Debtor did not have a beneficial ownership in the Union Court Property at the time of the resale. (*Id.* at 16.) Absent a beneficial ownership in the property, Appellants argue that the Debtor is not entitled to proceeds from the resale. (*Id.* at 17.)

Under Illinois' doctrine of equitable conversion, when the owner of land enters into a valid and enforceable contract for its sale, he holds the legal title, in trust for the buyer; the buyer

---

Debtor owed significant amounts in taxes and child support. (R. 3, 3-3, Bk. Dkt. No. 104 at 51.)

becomes the equitable owner and holds the purchase money in trust for the seller. *In re Lefkas Gen. Partners*, 112 F.3d 896, 901(7th Cir. 1997). The conversion takes place at the time the contract is entered. *Id.* The doctrine of equitable conversion, however, does not apply where the parties clearly intend that beneficial ownership of real estate not pass at execution of an installment land contract. *See Ruva v. Mente*, 572 N.E.2d 888, 892 (Ill. 1991)(finding the doctrine of equitable conversion inapplicable where the language in an installment contract indicated that no interest in the property would vest until the contract was fully performed).

Appellants argue that the parties did not intend ownership to pass to the Debtor until he fully performed his obligations under the Articles of Agreement.[11] (R. 14, Appellant Br. at 17.) Although the Articles of Agreement incorporates language favoring the Appellants' position, this language alone is not determinative of the parties' intent. *See In re Vinson*, 202 B.R. 972, 976 (Bankr. S.D. Ill. 1996)(finding that the contract provision reserving equitable title in the sellers until completion of payments by the debtor, was contrary to the parties' intent as manifested by the remainder of the contract, and thus did not prevent equitable conversion). The bankruptcy court relied on the unwritten side agreement between the parties to support its application of the doctrine of equitable conversion. (R. 3, 3-3, Bk. Dkt. No. 104 at 45-46.) The bankruptcy court found that the Debtor's intent, in the unwritten side agreement, was to retain his ownership interest in the Union Court Property. (*Id.* at 6.) This intent is in harmony with

---

[11] The specific language of the installment contract at issue in *Ruva* stated: "That no right, title or interest in the real estate or other assets involved herein shall vest in the Buyer until full compliance and performance with all of the terms, covenants and conditions hereof and delivery of Deed and Bill of Sale pursuant hereto." *Id.* at 890. Paragraph 18 of the Articles of Agreement is similar to the provision in *Ruva*, "No right, title or interest, legal or equitable, in the premises described herein, or in any part thereof, shall vest in the [Debtor] until the Deed, as herein provided, shall be delivered to the [Debtor]." (R. 3, 3-4, Trial Ex. PX-19 at 8.)

19

the doctrine of equitable conversion. *See In re Lefkas Gen. Partners*, 112 F.3d at 901.

Therefore, the bankruptcy court did not err in applying the doctrine of equitable conversion to determine that the Debtor retained beneficial ownership of the Union Court Property, and its assessment of damages was not clearly erroneous. Accordingly, this Court affirms the bankruptcy court's assessment of damages against Appellants in connection with the resale of the Union Court Property.

### B. Damages Arising From the Tunbridge Property Transfer

The bankruptcy court found that the Debtor fraudulently transferred the Tunbridge Property to Schlossberg pursuant to Sections 548(a)(1)(A) and (B) of the Bankruptcy Code. (R. 3, 3-3, Bk. Dkt. No. 104 at 28.) Schlossberg does not claim the bankruptcy court erred in finding the transfer was fraudulent, but rather, his claim is limited specifically to the amount of damages assessed against him. (R. 14, Appellant Br. at 18-19.) After a fraudulent transfer is found, the trustee may bring a second cause of action to recover the property transferred or its value pursuant to 11 U.S.C. § 550(a). *In re Phillips*, 379 B.R. at 780. Under Section 550(a), the trustee can recover the entire value of the property transferred, but actions are limited to only those that benefit the estate. *In re P.A. Bergner & Co.*, 140 F.3d 1111, 1118 (7th Cir. 1998); *Phillips*, 379 B.R. at 780. Furthermore, the trustee may recover the value of the property transferred even if it exceeds the debt to the creditor that provided the basis for the action as long as it benefits the estate. *Id.*

After the bankruptcy court found that the Tunbridge Property was fraudulently transferred, the Trustee could recover the property or its value from "the initial transferee." 11 U.S.C. § 550(a)(1). Although the term "transferee" is not defined in the Bankruptcy Code for the

20

purposes of Section 550(a), the Seventh Circuit has held that at a minimum, "transferee" has "dominion over the money or other asset, the right to put the money to one's own purposes." *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988); *see also In re Doctors Hosp. of Hyde Park, Inc.*, 373 B.R. at 72. The "initial transferee" is the first entity to have such a dominion or right. *In re Builders Plumbing & Heating Supply Co., Inc.*, No. 03 B 49243-49256, 2007 Bankr. LEXIS 505, at *22 (Bankr. N.D. Ill. Feb. 26, 2007). Accordingly, the bankruptcy court correctly concluded that Schlossberg was the initial transferee of the Tunbridge Property by virtue of his control over the property and ability to resell it to another purchaser in December 2005. (*See* R. 3, 3-3, Bk. Dkt. No. 104 at 30.)

The bankruptcy court imposed damages against Schlossberg in the amount of $95,000, the difference between the $420,000 fair market value of the Tunbridge Property and the $325,000 amount that Schlossberg paid the Debtor for the property. (*Id.* at 31.) Additionally, the bankruptcy court imposed $14,000 in damages, which represented the Debtor's portion of the profit on the resale of the Tunbridge Property. (*Id.*) Schlossberg argues that the Tunbridge Property was encumbered by debt in excess of its fair market value when the Debtor sold it, and therefore, the value of the Debtor's interest in the property was zero, since he did not have any equity in the property. (R. 14, Appellant Br. at 19.)

To determine value, the fair market value approach is generally followed by this district. *In re First Nat'l Parts Exch., Inc.*, No. 98 C 5915, 2000 U.S. Dist. LEXIS 10420, at *28 (N.D. Ill. July 12, 2000). Under this method, the proper measure for recovery under Section 550 is the market value at the time of transfer, less the consideration received. *Id.* Accordingly, the bankruptcy court assessed $95,000 in damages, the $420,000 market value of the property, less

21

the $365,000 that Schlossberg paid for the property. (R. 3, 3-3, Bk. Dkt. No. 104 at 31.) "Once

the whole transfer has been pulled into the estate, the money is distributed according to the

priorities established by the [Bankruptcy] Code and the debtor's own commitments." *In re FBN*

*Food Servs., Inc.*, 82 F.3d 1387, 1396 (7th Cir. 1996); *see also In re Phillips*, 379 B.R. at 780.

Accordingly, damages are not avoided based on the existence of a mortgage on the property.

Other circuits have held that fully encumbered property is not property in a bankruptcy estate

because there are no funds available from that property to pay creditors. *See In re Bean*, 252

F.3d 113, 117 (2d Cir. 2001). In this case, however, there was value in the Tunbridge Property,

and the mortgage was of little consequence to the transaction. The record reflects that either

Schlossberg and/or the Debtor convinced the mortgage company to accept less then the balance

due to avoid a cloud on the title, enabling Schlossberg to purchase the Tunbridge property and

then resell it unencumbered for a $130,000 profit. (R. 3, 3-3, Bk. Dkt. No. 104 at 13.) Thus, the

trustee may recover, for the benefit of the Debtor's estate, $95,000, the value of the property

transferred to Schlossberg.

In addition, the Court affirms the additional $14,000 in damages that the bankruptcy court

awarded against Schlossberg. There is evidence in the record that the Debtor and Schlossberg

entered an agreement whereby they would share in the profits on the resale of the Tunbridge

Property. (*See* R. 3, 3-4, Trial Ex. PX-35; R. 3, 3-5, Trial Ex. PX-48, PX-49, PX-62.) Pursuant

to this agreement, Schlossberg would buy the Tunbridge Property for less than the property's

value and then resell it, splitting forty percent of the profit with the Debtor. (R. 3, 3-3, Bk. Dkt.

No. 104 at 13.) Through this agreement, the Debtor retained an interest in the property. On

December 9, 2005, Schlossberg resold the Tunbridge Property for $455,000. (*Id.*) Thus,

Schlossberg made a profit of $35,000, of which the Debtor was entitled to forty percent. Accordingly, the bankruptcy court found that the Trustee could recover $14,000, forty percent of Schlossberg's profit. This Court affirms that decision.

### C. Sanctions Order Against Schlossberg

Finally, Schlossberg argues that the bankruptcy court abused its discretion in the April 11, 2008, Sanctions Order issued against him for discovery violations. (R. 14, Appellant Br. at 20.) The Federal Rules of Civil Procedure permit a court to sanction a party for failing to obey a discovery order. *See* Fed. R. Civ. P. 37(b)(2)(B). When ordering the sanctions of default judgment or dismissal for discovery violations, the court must find that the party's actions displayed willfulness, bad faith, or fault. *Collins v. Illinois*, 554 F.3d 693 (7th Cir. 2009). Under the abuse of discretion standard, "an appellant faces an uphill battle" in seeking to reverse a lower court's sanction order. *In re Golant*, 239 F.3d 931, 937 (7th Cir. 2001). A court's decision will be upheld so long as it could be considered reasonable. *Collins*, 554 F.3d at 693.

Here, the bankruptcy court found that Schlossberg had a duty to preserve electronic files pursuant to the electronic document retention letter, and that the electronic files and data were destroyed in violation of this duty. (R. 3, 3-6, 4/11/08 Hearing Transcript at 11:21-13:13.) The bankruptcy court ordered that the designated facts alleged against Schlossberg would be taken as established, prohibited Schlossberg from opposing the Trustee's claims against him, and taxed him various fees and costs associated with Trustee's counsel and the computer expert. (R. 3, 3-3, Bk. Dkt. No. 94 at 2.) Schlossberg argues that the bankruptcy court did not make a finding of willfulness or bad faith on his part, and therefore the Sanctions Order was issued in clear error. (R. 14, Appellant Br. at 21.)

Bad faith is found when conduct is "intentional or in reckless disregard of a party's obligations to comply with a court order." *Rice v. City of Chicago*, 333 F.3d 780, 785 (7th Cir. 2003)(quoting *Marrocco v. General Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992)). The Seventh Circuit has recently questioned whether a default judgment from a discovery violation must be supported by "clear and convincing evidence," as opposed to a "preponderance of the evidence" standard. *Ridge Chrysler Jeep, LLC v. Daimler Chrysler Fin. Serv. Americas LLC*, 516 F.3d 623, 625 (7th Cir. 2008)(noting that neither a statute or the Constitution requires an elevated burden for dismissal as a sanction, when the burden in the underlying suit is a preponderance of the evidence); *Wade v. Soo Line R.R. Corp.*, 500 F.3d 559, 564 (7th Cir. 2007). The Court finds that under either standard, there is sufficient evidence of Schlossberg's bad faith.

Beginning in December 2007, Schlossberg was under an obligation to retain all electronic discovery related to the Trustee's adversary proceeding. (*See* R. 3, 3-3, Bk. Dkt. No. 86, Ex. A.) On March 24, 2008, the Trustee filed a motion to compel Schlossberg to provide access to all computers that contained data related to the transfers. (R. 3, 3-3, Bk. Dkt. No. 60.) After reviewing three computers that were utilized by Schlossberg, the computer expert concluded: (1) that a disk cleaning program called "nCleaner" was installed and launched on at least two computers as of April 1, 2008; (2) over 16,000 files on at least two computers had been destroyed on or around April 1, 2008; (3) overwriting operating systems were installed on two of the computers in January - February 2008; and (4) a program to verify the integrity of the data destruction had been installed on the computers. (R. 3, 3-3, Bankr. Dk. No. 88, Ex. A at 3-10.) Even if Schlossberg did not destroy the files himself, the bankruptcy court found that at the very least Schlossberg acted in "reckless disregard" of his discovery obligations. (R. 3, 3-6, 4/11/08

24

Hearing Transcript at 10:17-11:4.) Such disregard is sufficient to establish bad faith. *See In re Thomas Consol. Indus. Inc.*, 456 F.3d 719, 726 (7th Cir. 2006)(". . . blatant disregard of the bankruptcy court's order was more than sufficient to demonstrate the bad faith finding that justified dismissal.").

Accordingly, the bankruptcy court's determination that Schlossberg acted in bad faith because he violated his duty to preserve the electronic files was not in error. Moreover, the bankruptcy court did not abuse its discretion when it issued the Sanctions Order. The sanctions imposed against Schlossberg are not unreasonable in light of the broad discretion afforded to the bankruptcy court in determining sanctions. *See Golant*, 239 F.3d at 937 (a lower court is not required to select the least severe sanction, as long as the sanction selected is reasonable). Therefore, the Sanctions Order is affirmed.

## CONCLUSION

For these reasons above, the judgment of the United States Bankruptcy Court is affirmed. The Clerk of the Court is directed to enter a final judgment in favor of the Trustee/Appellee and against Appellants Schlossberg and Laliberte.

Entered: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated: March 11, 2009**

25